1
2
3
4
5
6
7
8            **UNITED STATES DISTRICT COURT**
9            **EASTERN DISTRICT OF CALIFORNIA**
10
11   BYRON WOOTEN,                          )  Case No.: 1:10-cv-00717-LJO-JLT
                                            )
12            Petitioner,                   )  FINDINGS AND RECOMMENDATIONS TO
                                            )  DENY PETITION FOR WRIT OF HABEAS
13        v.                                )  CORPUS (Doc. 1)
                                            )
14   BRYAN HAWS, Warden,                    )
                                            )  ORDER DIRECTING THAT OBJECTIONS BE
15            Respondent.                   )  FILED WITHIN TWENTY DAYS
                                            )
16   _____

17         Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.

19                          **PROCEDURAL HISTORY**

20         Petitioner is in custody of the California Department of Corrections and Rehabilitation

21   ("CDCR") serving an indeterminate sentence of thirty-nine years, eight months-to-life pursuant to a

22   judgment of the Superior Court of California, County of Kern (the "Superior Court") as a result of a

23   February 6, 2008 conviction on one count of second degree murder (Cal. Pen. Code § 187(a)), five

24   counts of attempted second degree murder (§§ 664, 187(a)), and one count of hit and run (Cal. Veh.

25   Code § 20001(a)).  (Lodged Document ("LD") 1).

26         Petitioner subsequently filed a direct appeal in the California Court of Appeals, Fifth Appellate

27   District (the "5th DCA"), which, in an unpublished decision, affirmed Petitioner's conviction.  (LD 1,

28   2).  Subsequently, the California Supreme Court denied Petitioner's petition for review.  (LD 5).

                                            1

1    On April 22, 2010, Petitioner filed the instant petition.  (Doc. 1).  On October 7, 2010,

2    Respondent filed an Answer.  (Doc. 15).  On November 8, 2010, Petitioner filed a Traverse.  (Doc.

3    17).  Respondent's Answer contends that Petitioner's claim of ineffective assistance of counsel at

4    sentencing is not exhausted.  (Doc. 15, p. 5).  Respondent does not address whether the remaining

5    ineffective assistance of counsel claim is exhausted or not.

6                                    **FACTUAL BACKGROUND**

7    The Court adopts the Statement of Facts in the 5th DCA's published/unpublished decision:

8    On May 9, 2005, appellant was driving his car in the neighborhood where his cousin, Ronnie
     Hill, lived. Hill was on the street in front of his house with five boys-seventh and eighth
9    graders-who played on the basketball team Hill coached. Appellant got into a verbal argument
10   with Hill, which lasted a few minutes, and appellant then drove off.

11   Several minutes later, appellant returned with his mother, Ruth Lee, in the passenger seat. Lee
     got out of the car and argued with Hill. According to Lee, Hill called appellant a "wuss" and
12   "puss," and the other boys were repeating the same. When Lee got back into the car, appellant
13   drove half way down the block, made a U-turn, and then drove his car toward Hill.

14   Hill and the boys were standing in the curb area of the street. Appellant's car struck Hill as he
     tried to jump onto the curb. The impact cracked Hill's rib. Appellant also struck the five boys.
15   Kezdren Blakely was hit in his lower body, which bruised a bone. Jeremy Dixon was struck in
     the hip, causing pain in his neck, back, and leg. Derrick Fench was bumped off his bicycle.
16   Maurice Smallwood was hit and became trapped underneath the car. He was dragged down the
     street by appellant's car until Hill's brother, DeVon Johnson, stepped in front of the car and
17   stopped appellant. Smallwood suffered a cut to his lip and his feet were scarred, requiring skin
     grafts. The parties stipulated that Smallwood suffered great bodily injury. Reginald Johnson
18   was struck and his body was also caught underneath the car. A back tire ran over Reginald
19   Johnson's head, crushing his skull and killing him within a matter of seconds.

20   Appellant's mother told an investigating officer that she believed appellant had been trying to
21   hit Hill but not the other boys. Two witnesses observed appellant drive consciously and
     deliberately at Hill and the group of boys. There was a history of enmity between appellant and
22   Hill.

23   Officer Donald Cegielski, an accident reconstructionist, testified that tire marks in the gutter,
24   close to the curb, were "acceleration skids" caused by applying the accelerator rather than by
     hitting the brakes as appellant approached Hill and the boys.
25
26   Defense

27   Appellant called witnesses who attacked Hill's character, suggesting he was aggressive and
     violent. Appellant's mother testified that Hill, who had pending charges for resisting the police
28

                                                    2

in the performance of their duties and spousal abuse, would "torment" appellant by constantly challenging him to fight.

Numerous witnesses testified that violent behavior and aggression were uncharacteristic of appellant. His mother said he never started a fight in school. His former girlfriend, Priscilla Garcia, testified that appellant never fought with her and he was not aggressive. On one occasion, when they were in his car together, Hill taunted appellant, but appellant just drove away. Garcia's mother testified that appellant was always respectful of Priscilla, as well as of herself and her husband. She had never known appellant to be confrontational or aggressive. Appellant's former football coach testified that he never saw aggressive or confrontational behavior on appellant's part.

Neuropsychiatrist Jeff Victoroff testified as an expert on attention deficit hyperactivity disorder (ADHD), a genetic brain disease that affects 3 to 7 percent of children, primarily boys. Victoroff explained three types of ADHD: a combination of inattention and hyperactivity type, a predominately inattentive type, and a predominately hyperactive-impulsive type. Dr. Victoroff explained that the hyperactivity tends to disappear in the teen years, but at least half of the children with the disorder have impairing symptoms in adulthood.

Dr. Victoroff testified that appellant was diagnosed with ADHD at the age of 12. The neurologist who diagnosed appellant described him as "more attention deficit disorder rather than hyperactivity." The neurologist started appellant on a medication, Cylert, at the dosage of 37.5 milligrams a day. There was no record of when appellant stopped taking the medication; appellant could not remember, and medical records were more than a decade old.

According to Dr. Victoroff, the prefrontal cortex of a person with ADHD is abnormal. The prefrontal lobe of the brain is needed "for reasoning, planning, making a judgment about what you ought to do and realizing the consequences." In a person with ADHD, the prefrontal lobe is smaller than a "normal" brain, making the part of the brain that governs drive and impulse predominant. As summarized by Victoroff:

"[P]eople with attention deficit disorder have abnormal brains. They are abnormal from infancy, and about half of them continue to be abnormal into adulthood. The brain areas are small and shrunken compared with normal. The electrical activity is abnormal, function is very abnormal, and the worst problem is with the prefrontal cortex. [¶] When faced with a conflict, a threat, a provision, patients with ADHD may be slow to react at first because of their delayed brain processing. But when they do react their brains can't use the sophisticated frontal lobes that evolves late in human development to think through and make a good decision or stop a bad decision. And the act only uses the part of the brain that animals use, the primitive parts."

Dr. Victoroff examined appellant for five and a half hours, during which time he interviewed him and performed psychiatric, cognitive, and neurological exams. Victoroff testified that appellant's brain CT scan showed signs of his having been knocked unconscious in the past, but he could not state how serious the injuries were as no MRI was done. Also, this had no relationship to appellant's ADHD.

3

Dr. Victoroff was asked a hypothetical question: What impact would it have on someone with ADHD if he went to a location where he knew another person consistently challenged him to fight, he took his mother to this place to show her how the individual tormented him, the individual confronted the mother and called her names, and others around called him a coward? Dr. Victoroff answered first by describing how a normal person might react and then comparing a person with ADHD:

"Well, you and I, and I suspect everyone in this room, would probably respond to a provocation with an immediate gut reaction. You know, they might swear. We might pound our ... dashboard. But we would think through what the consequences would be if we did anything beyond that. We would think, okay, if I put my foot on the pedal of the car with this amount of pressure, if I hold the steering wheel and angle it like that, and if I'm aiming toward humans there could be horrible consequences. I can't do that. I'm not going to do that. But that's a sort of a conscious thinking through of the consequences of your behaviors. [¶] ... [¶] ... The person with the ADHD-I mean I shouldn't make it seem like it's black and white. It's not as if it's all or none. But a person with ADHD has a very small ability, an abnormal neurologic ability to stop themselves from acting on their primitive instincts in extreme circumstances."

On cross-examination, Dr. Victoroff acknowledged that the last medical opinion, prior to his own, stating appellant suffered from ADHD, was dated January of 1998. A medical exam in 2001, when appellant was 16, made no reference to ADHD at all. Dr. Victoroff opined that, at age 20, when the event occurred, appellant's ADHD was in partial remission, and he suffered more from inattentiveness than he did from hyperactivity. According to Dr. Victoroff, half of the people who have been diagnosed with ADHD continue to have symptoms as adults that "disrupt[ ] their life."

When Dr. Victoroff asked appellant about the incident on May 9, 2005, appellant said, "So I wanted a scare tactic. If he is going to mess with me I am going to scare him. Swerved toward him. I didn't intend to kill him or nobody." When asked if an individual intentionally driving a car toward another individual was acting in disregard for that person's life, Dr. Victoroff responded:

"If someone is deliberately aiming a car at me, whether they intend to-now what they intend at that minute may vary dramatically from one person to the next. One person may think in his mind I am going to scare the living daylights out of that person, and another person may think in his mind I am going to run over that person. Different brains will allow the person to consider the possibility that I might get killed to different degrees. [¶] So the whole point that we are talking about here is that if your brain doesn't consider the consequences, potential consequences of an idiotic, extremely dangerous action, then you may not realize that you are putting people's lives in danger at that moment. You should. You damn well ought to realize that you are putting people's lives in danger. But you may not."

(LD 1).

///

///

4

# DISCUSSION

I.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997);  Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.    Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he can show that the state court's adjudication of his claim:

    (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2)  resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d);  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);  Williams v. Taylor, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams v. Taylor, 529 U.S. 326, 405-406 (2000).

A state court decision involves an "unreasonable application" of clearly established federal law "if the state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable manner." Id., quoting Williams, 529 U.S. at 409-410; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)(per curiam).

Consequently, a federal court may not grant habeas relief simply because the state court's decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409). In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. If fairminded jurists could so disagree, habeas relief is precluded. Richter, 131 S.Ct. at 786. As the United States Supreme Court has noted, AEDPA's standard of "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law" is "difficult to meet," because the purpose of AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme malfunctions in the state criminal justice systems,'" and not as a means of error correction. Richter, 131 S.Ct. at 786, quoting Jackson v. Virginia, 443 U.S. 307, 332, 99 S.Ct. 2781, n. 5 (1979)(Stevens, J., concurring in judgment). The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 131 S.Ct. at 787-788.

Moreover, federal "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen, 131 S.Ct. at 1398 ("This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at the same time–i.e., the record before the state court.")

6

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520;  Jeffries v. Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment").  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id. ; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

The AEDPA also requires that considerable deference be given to a state court's factual findings.  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. at 340.  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-077 (2004).

To determine whether habeas relief is available under § 2254(d),  the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991);  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law."  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).   Where the state court denied the petitioner's

7

claims on procedural grounds or did not decide such claims on the merits, the deferential standard of the AEDPA do not apply and the federal court must review the petitioner's 's claims de novo.  Pirtle v. Morgan, 313 F.3d at 1167.

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002);  Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

III.  Review of Petitioner's Claims.

The instant petition itself alleges the following as grounds for relief: (1) ineffective assistance of trial counsel during trial; and (2) ineffective assistance of trial counsel at sentencing.

A.  Exhaustion.

As a threshold issue, Respondent has raised the issue of whether the second ground for relief has been fully exhausted, and, therefore, the Court will address that issue before turning to the merits of Petitioner's claims.

A petitioner who is in state custody and wishes to collaterally challenge his conviction by a petition for writ of habeas corpus must exhaust state judicial remedies.  28 U.S.C. § 2254(b)(1).  The exhaustion doctrine is based on comity to the state court and gives the state court the initial opportunity to correct the state's alleged constitutional deprivations.  Coleman v. Thompson, 501 U.S. 722, 731 (1991);  Rose v. Lundy, 455 U.S. 509, 518 (1982); Buffalo v. Sunn, 854 F.2d 1158, 1163 (9th Cir. 1988).

A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court.  Duncan v. Henry, 513 U.S. 364, 365 (1995); Picard v. Connor, 404 U.S. 270, 276 (1971); Johnson v. Zenon, 88 F.3d 828, 829 (9th Cir. 1996).  A federal court will find that the highest state court was given a full and fair opportunity to hear a claim if the petitioner has presented the highest state court with the claim's factual and legal basis.  Duncan, 513 U.S. at 365 (legal basis); Kenney v. Tamayo-Reyes, 504 U.S. 1, 112 S.Ct. 1715, 1719 (1992) (factual basis).

Additionally, the petitioner must have specifically told the state court that he was raising a federal constitutional claim.  Duncan, 513 U.S. at 365-66; Lyons v. Crawford, 232 F.3d 666, 669 (9th Cir. 2000), amended, 247 F.3d 904 (2001); Hiivala v. Wood, 195 F.3d 1098, 1106 (9th Cir. 1999); Keating v. Hood, 133 F.3d 1240, 1241 (9th Cir. 1998).  In Duncan, the United States Supreme Court reiterated the rule as follows:

> In Picard v. Connor, 404 U.S. 270, 275 . . . (1971), we said that exhaustion of state remedies requires that petitioners "fairly presen[t]" federal claims to the state courts in order to give the State the "opportunity to pass upon and correct alleged violations of the prisoners' federal rights" (some internal quotation marks omitted).  If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution. If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.

Duncan, 513 U.S. at 365-366.  The Ninth Circuit examined the rule further, stating:

> Our rule is that a state prisoner has not "fairly presented" (and thus exhausted) his federal claims in state court *unless he specifically indicated to that court that those claims were based on federal law*. See Shumway v. Payne, 223 F.3d 982, 987-88 (9th Cir. 2000). Since the Supreme Court's decision in Duncan, this court has held that the *petitioner must make the federal basis of the claim explicit either by citing federal law or the decisions of federal courts, even if the federal basis is "self-evident*," Gatlin v. Madding, 189 F.3d 882, 889 (9th Cir. 1999) (citing Anderson v. Harless, 459 U.S. 4, 7 . . . (1982), or the underlying claim would be decided under state law on the same considerations that would control resolution of the claim on federal grounds. Hiivala v. Wood, 195 F3d 1098, 1106-07 (9th Cir. 1999); Johnson v. Zenon, 88 F.3d 828, 830-31 (9th Cir. 1996); . . . .

> In Johnson, we explained that the petitioner must alert the state court to the fact that the relevant claim is a federal one without regard to how similar the state and federal standards for reviewing the claim may be or how obvious the violation of federal law is.

9

Lyons v. Crawford, 232 F.3d 666, 668-669 (9th Cir. 2000) (italics added).

Here, Respondent does not expressly contend that the first ground for relief is unexhausted, but instead alleges that the second claim for relief "does not appear to be exhausted." (Doc. 15, p. 5). Obviously, not all possible variants of an ineffective assistance claim are exhausted by presenting only one of those variants to the California Supreme Court. In this instance, however, it is clear that both claims are fully exhausted. The Court has examined the Petition for Review filed by Petitioner in the state court. (LD 5). The Petition for Review sets out an ineffective assistance claim for both trial counsel's conduct during trial, the basis for ground one, and his failure to present mitigating evidence at sentencing, the basis for ground two. Hence, for purposes of these habeas proceedings, all grounds for relief in the instant petition are exhausted. The Court will therefore address the merits of Petitioner's claims.

B.   Ineffective Assistance of Trial Counsel During Trial.

Petitioner argues that trial counsel was ineffective in vigorously pursuing a defense of provocation/heat of passion to reduce the offense from homicide to voluntary manslaughter, a defense Petitioner contends lacks any factual basis, rather than arguing that Petitioner's mental disability, i.e., Attention Deficit Hyperactive Disorder ("ADHD"), limited his mental capacity to form a culpable mens rea, such that Petitioner could not have acted with either an intent to kill or a conscious disregard for human life, which would have reduced the offense from homicide to involuntary manslaughter. For the reasons set forth below, the Court disagrees with Petitioner's contention.

1.   The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim of ineffective assistance during trial as follows:

Appellant's only argument on appeal is that he was denied effective assistance of counsel because trial counsel failed to inform the jury that appellant could be convicted of involuntary manslaughter, rather than murder, if the jury found that appellant's mental defect or disorder prevented him from appreciating the risk to human life involved in his act of driving toward the six victims. Competent trial counsel, in appellate counsel's view, would have spent less time than did counsel here trying to convince the jury that it should adopt a provocation/heat of passion analysis and convict only of the lesser offense of voluntary manslaughter. That approach, according to appellate counsel, went nowhere because it required that the jury apply an objective standard to determine the adequacy of the provocation-a standard that would not consider appellant's particular mental condition or state. Instead, according to appellate counsel, trial counsel should have pursued a conviction of involuntary manslaughter, on the

10

basis that neither express nor implied malice was present because appellant did not intend to kill and did not act in conscious disregard of the risk his conduct posed to human life. To quote from appellant's opening brief: "Trial counsel knew his client was mentally impaired. The nature of his impairment readily fit the elements for involuntary manslaughter and attempted involuntary manslaughter. His impairment did not fit the requisite elements for voluntary manslaughter. Yet, trial counsel pursued only the latter theory." As a result, appellant claims, the jury was left with little choice but to convict him of second degree murder and attempted murder. We reject appellant's claim.

First, we note, the appellate claim regarding the attempted murder counts is fatally flawed. There is no crime of attempted involuntary manslaughter. (People v. Johnson (1996) 51 Cal.App.4th 1329, 1332, 59 Cal.Rptr.2d 798.) An attempt requires a specific intent and, thus, attempted involuntary manslaughter would be a contradiction in terms. (Ibid.) Appellate counsel acknowledged this problem at oral argument and abandoned his contention that trial counsel was ineffective in failing to urge conviction for a nonexistent crime.

Second, our review of the record on appeal causes us to reject the premise that trial counsel sought only a voluntary and not an involuntary manslaughter conviction on count 1. It is true that his comments on involuntary manslaughter, in closing argument, were vague:

> "Now, this prosecutor has ... told you that, you know, discount involuntary manslaughter. It doesn't even fit. Well, you know, I am not going to go through the whole definition of involuntary manslaughter. You look at it. You are going to have it in your jury instructions. Look at the definition. It talks about the conduct being flagrant. It's not just an accident.... Look at the definition. It may very well fit into this circumstance. You were given that offense and you were given the elements of it. Look at it carefully."

But his comments on voluntary manslaughter were equally directed at something other than educating the jury about the elements of the offense:

> "You know, I was going to go through all the first degree, second degree, voluntary manslaughter. But [the prosecutor's] PowerPoint presentation did a great job of showing you that.... What I do suggest to you is that his discounting voluntary manslaughter as a viable ... offense that he should be charged with is wrong. That is wrong. [¶] Heat of passion, adequate provocation, those are the legal terms that we lawyers use to express to you what that person has to feel like or act like when he commits an offense.... [¶] And it's true it is an objective standard. But just because it's an objective standard and they are talking about the reasonable person doesn't mean that that excludes [appellant] in this kind of circumstance. All those factors that you heard about his mental condition are absolutely critical. They are absolutely important. And you folks should consider them."

Neither do we accept the implication that the jury was unaware of the option of convicting appellant of involuntary manslaughter. The jury was given a full set of instructions on involuntary manslaughter, including (1) an instruction that the jury could consider the evidence of appellant's mental defect or disorder in determining (inter alia) whether he harbored malice

11

aforethought, (2) an instruction that "[e]very person who unlawfully kills a human being without malice aforethought and without an intent to kill and without conscious disregard for human life is guilty of the crime of involuntary manslaughter," (3) an instruction that explained the concept of conscious disregard for human life, and (4) an instruction that involuntary manslaughter was a lesser included offense to the murder charge in count 1. Also, the jury was provided with verdict forms that included a form for conviction of involuntary manslaughter in count 1.

In these circumstances, we find it particularly appropriate to refrain from second-guessing trial counsel's tactical decisions regarding how his case should be argued to the jury. (See People v. Avena (1996) 13 Cal.4th 394, 444, 53 Cal.Rptr.2d 301, 916 P.2d 1000 [reviewing court should be careful not to second-guess wisdom of tactical choices when considering claim of ineffective assistance of counsel].)

Finally, we question whether appellant can show the prejudice required for his claim of ineffective assistance of counsel. Such a claim must satisfy two requirements:

"'First, the defendant must show that counsel's performance was deficient.... Second, the defendant must show that the deficient performance prejudiced the defense....' To establish prejudice he 'must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citation.]" (Williams v. Taylor (2000) 529 U.S. 362, 390-391, 120 S.Ct. 1495, 146 L.Ed.2d 389; see People v. McPeters (1992) 2 Cal.4th 1148, 1187, 9 Cal.Rptr.2d 834, 832 P.2d 146, abrogated by statute on another point as recognized in Verdin v. Superior Court (2008) 43 Cal.4th 1096, 1106-1107, 77 Cal.Rptr.3d 287, 183 P.3d 1250.)

Appellant's fully instructed jury convicted him not only of second degree murder in count 1 but also of five counts of attempted murder. As the jury was instructed, conviction on the attempted murder counts required a finding that the attempt was committed with express malice aforethought-that is, with specific intent to kill. (CALJIC No. 8.66.) The jury also was instructed on the "kill zone" theory of concurrent intent to kill, which emphasized the element of intent. (See People v. Bland (2002) 28 Cal.4th 313, 330-331, fn. 6, 121 Cal.Rptr.2d 546, 48 P.3d 1107; CALJIC No. 8.66.1.) And the jury was instructed, regarding the distinction between an attempt and "mere preparation," that the "acts of a person who intends to kill ... will constitute an attempt where those acts clearly indicate a certain unambiguous intent to kill."

Appellant has suggested, and we are aware of, nothing in the record that would have caused the jury to find that appellant intended to kill five of his six victims but did not intend to kill the sixth victim, who actually died.  In short, we believe the jury made a finding of express malice with regard to all of the murder and attempted murder counts. We fail to see how appellant was prejudiced by trial counsel's alleged failure to argue the absence of implied malice when the jury found there was express malice. (Cf. People v. Rogers (2006) 39 Cal.4th 826, 884, 48 Cal.Rptr.3d 1, 141 P.3d 135 [failure to instruct on involuntary manslaughter harmless where jury fully instructed on first degree premeditated murder, implied malice second degree murder and heat of passion voluntary manslaughter (both of which require higher degree of culpability

than involuntary manslaughter) and jury found defendant guilty of first degree premeditated murder].)

We thus conclude that, even were we to find that trial counsel's performance was deficient, we would not find the deficiency prejudicial.

(LD 1, pp. 6-10).

       2.   Discussion.

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to Strickland 's two-pronged test. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of appellate counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that appellate counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052 (1984). Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the appeal. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance.  Knowles v. Mirzayance, 556 U.S. ___, 129 S.Ct. 1411, 1419 (2009).  Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold."  Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Knowles v. Mirzayance, 556 U.S. ___, 129 S.Ct. at 1420.  In effect, the

1  AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state

2  court determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

3  Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland standard is a general standard, a state

4  court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

5  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule application was

6  unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway

7  courts have in reaching outcomes in case-by-case determinations").

8        Here, the state court identified the appropriate federal standard by applying Strickland.[1]  Thus,

9  the only issue is whether the state court's adjudication, i.e., that defense counsel's representation was

10  neither deficient nor prejudicial, was not contrary to or an unreasonable application of Strickland.  For

11  the reasons discussed below, the Court concludes that it was not.

12        In brief, Petitioner contends that trial counsel was ineffective in urging a provocation/heat of

13  passion analysis that would have supported a conviction for voluntary manslaughter rather than

14  utilizing the testimony regarding Petitioner's ADHD to urge a conviction for the involuntary

15  manslaughter since Petitioner's mental disability, he contends, would have precluded him from

16  forming the necessary *mens rea* for either second degree murder or voluntary manslaughter.  There

17  are, however, several significant problems with Petitioner's argument.

18        First, it is uncontroverted the jury was instructed on all of the charges for which he was

19  convicted, i.e., second degree murder and attempted murder, including the requisite mental states and

20  applicable defenses, as well as on the lesser offenses of involuntary and voluntary manslaughter, for

21  which Petitioner was not convicted, as well as provocation/heat of passion as a defense.  It is also

22  uncontroverted that the defense presented substantial evidence of Petitioner's ADHD that was

23  essentially uncontroverted by the prosecution.  Finally, it is uncontroverted that, in closing argument,

24  defense counsel actually argued for a conviction on either voluntary or involuntary manslaughter as an

25  alternative to second degree murder based on, respectively, provocation/heat of passion and

26  Petitioner's mental condition.  Given these circumstances, Petitioner's argument is reduced to a claim

27  that counsel should have argued more vehemently and cogently to the jury for the mental disability

28

---

[1] The 5th DCA cited Williams v. Taylor, 529 U.S. at 390-391, which, in turn, refers to Strickland.

14

1   approach that Petitioner now believes would have been more successful.  This, however, is a very

2   slender reed upon which to premise a <u>Strickland</u> claim.

3          How vociferously should counsel have argued for involuntary manslaughter based on ADHD

4   in order for his representation to be deemed "effective"?  Given that the jury was fully instructed on

5   involuntary and voluntary manslaughter and had heard all of the testimony regarding Petitioner's

6   mental condition, how is a habeas court to assess, with four years' worth of hindsight, whether a few

7   additional words during closing argument or directing the jury's attention to an instruction they would

8   soon have for reference in the jury room would have tipped the balance between conviction on

9   involuntary manslaughter rather than second degree murder?  Finally, and most significantly, how is

10  this Court to "grade" counsel's performance when the issue is not the counsel's abject failure to

11  present a certain argument to the jury or to perform a certain task in his representation, but his failure,

12  in the eyes of his client, to more effectively make such arguments or complete such tasks?

13         Such imponderable questions are susceptible only to surmise and conjecture; they defy any

14  bona fide objective legal analysis regarding the competency of counsel's representation at trial.

15  Fortunately, however, the Court need not tarry long on these questions since the 5th DCA's

16  adjudication concluded that Petitioner had not met the prejudice prong of <u>Strickland</u>.  As the Supreme

17  Court itself recognized, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of

18  sufficient prejudice, which we expect will often be so, that course should be followed."  <u>Strickland</u>,

19  466 U.S. at 697.

20         Here, as the 5th DCA noted, Petitioner was convicted of five counts of attempted murder in

21  addition to the second-degree murder conviction.  Thus, the jury found that Petitioner acted with the

22  requisite mental state of express malice aforethought.  The state court then rejected as entirely

23  implausible the prospect that the jury found that Petitioner acted with express malice aforethought in

24  attempting to kill the five victims who survived but did not act with that same malice aforethought in

25  murdering the one victim who actually died.  Hence, the state court reasoned, because the jury found

26  that Petitioner acted with express malice as to all the victims, trial counsel's failure to argue the

27  absence of *implied* malice, a lesser mental state necessary for manslaughter, would not have been

28  successful and could not have constituted deficient representation under <u>Strickland</u>.

1         A similar, though not identical, situation was addressed by the Ninth Circuit in <u>Baer v.</u>

2    <u>Terhune</u>, 66 Fed. Appx. 91 (9th Cir. 2003)(not selected for official publication).  In that case, petitioner

3    challenged his state court conviction for second degree murder of his wife by contending that the trial

4    court should have given instructions on involuntary intoxication and involuntary manslaughter due to

5    unconsciousness, i.e., having taking nine or ten Vicodin pills prior to the assault.  Petitioner argued

6    that the trial court erred in failing to give the instructions and that his attorney provided ineffective

7    assistance in failing to request them.  In rejecting those contentions, the Ninth Circuit held as follows:

8         Baer was convicted of second-degree murder, which necessarily requires a finding of malice.
     The jury was instructed that a finding of intoxication could rebut the mental state necessary to
9         convict of second-degree murder; they were further instructed that if Baer did not act with the
     requisite mental state for second-degree murder, they should convict of, at most, involuntary
10        manslaughter.

11        Because the jury convicted Baer of second-degree murder and not involuntary manslaughter, it
12        is clear that the jury found that Baer made a deliberate choice to disregard the danger in acting
     as he did.  The jury evidently did not believe that Baer was so intoxicated by the Vicodin that
13        he did not act with malice.  The jury instructions that Baer asserts were improperly omitted
     could only have impacted the verdict if the jury believed that Baer's intoxication prevented a
14        deliberate choice; because, by finding malice, the jury rejected this pivotal element, none of the
     jury instructions that Baer now seeks could have resulted in a different verdict.
15

16   <u>Baer</u>, 66 Fed. Appx. at 92.

17        Similarly, in this case the jury's verdict could only have been impacted by counsel's failure to

18   stress Petitioner's mental disability if the jury believed that Petitioner did not act with express malice.

19   Unlike <u>Baer</u>, Petitioner does not contend that the trial court failed to instruct the jury on any possible

20   defenses nor does he contend that counsel failed to put forward the appropriate instructions. Indeed,

21   the proper instructions were given, the evidence of the mental disability was presented, and the lesser

22   offenses were actually argued by counsel.  Thus, the argument that counsel should have better argued

23   Petitioner's lack of malice is significantly weaker than in <u>Baer</u>.  Given the Ninth Circuit did not find

24   prejudice in <u>Baer</u>, the Court has little hesitation in finding there is no prejudice here.

25        Moreover, the 5th DCA recognized that defense counsel made a tactical or strategic choice to

26   emphasize the provocation/heat of passion defense rather than the mental disability defense.  Federal

27   habeas courts cannot second-guess counsel's strategic decision to present or forego a particular theory

28   of defense that appears reasonable under the circumstances.  <u>See Strickland</u>, 466 U.S. at 681

16

1   ("Because advocacy is an art and not a science, and because the adversary system requires deference

2   to counsel's informed decisions, strategic choices must be respected in these circumstances if they are

3   based on professional judgment."); <u>United States v. Chambers</u>, 918 F.2d 1455, 1461 (9th Cir. 1990).

4   Even assuming that Petitioner is correct that the ADHD evidence did not really "fit" within a defense

5   of provocation/heat of passion as it would have with involuntary manslaughter, the Court simply

6   cannot say it was unreasonable for counsel to have emphasized the provocation/heat of passion

7   evidence, perhaps with the expectation that jurors would more easily empathize with and relate to

8   evidence of anger than they would to the more technically complex and medically challenging

9   testimony about ADHD.[2]

10        As to Petitioner's argument that the provocation/heat of passion theory was not supported by a

11   factual basis because it requires an objective standard that excludes the reality of Petitioner's mental

12   disability, as established by Victoroff's testimony, the Court finds this contention unpersuasive.  That

13   Petitioner's brain may not be "normal" in its ability to deal with provocation, conflict, or threat, does

14   not mean that the jury could not have concluded that the prior history of acrimony between Petitioner

15   and the victim, together with the taunting that occurred on the day of the incident, along with the

16   presence of Petitioner's mother to witness these verbal assaults, would have provoked a reasonable

17   person to react violently.  Although the jury ultimately did not reach this conclusion, the mere fact that

18   Petitioner's own mental condition may have given him a diminished ability to deal rationally with

19   such a confrontation does not, by itself, exclude the possibility that the facts introduced at trial

20   provided some factual basis for such a finding or that a reasonable juror could have applied an

21   objective standard and found in Petitioner's favor.[3]

22

23

24   [2] Although Petitioner correctly notes that a defense counsel's strategies are entitled to deference only when they are reasonable, for the reasons set forth in the Findings and Recommendations, the Court has concluded that counsel's emphasis on provocation/heat of passion instead of mental disability was not unreasonable.

25

26   [3]The Court is mindful that originally, Petitioner was sentenced to fifteen years to life based on his no contest plea, that he successfully petitioned the state court to withdraw that plea in order to present evidence of his ADHD, that he had a trial at

27   which an expert testified to Petitioner's mental disability after which he was convicted and sentenced to a prison term that was at least 24 years longer than his original one.  The tragedy that getting what Petitioner wanted, i.e., the ability to present mental disability evidence to a jury, resulted in a sentence several decades longer than his original one, is not lost

28   on this Court.  However, after carefully reviewing the record and applying the appropriate standards of review, the Court is confident that the state court adjudication did not violate Petitioner's federal constitutional rights.

In sum, the arguments presented here by Petitioner have not overcome the presumption that counsel's performance was within the wide range of reasonable assistance, and that counsel exercised acceptable professional judgment in all significant decisions made.  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990).  From the foregoing, the Court must conclude that the state court adjudication was not contrary to nor an unreasonable application of Strickland.

C.   Ineffective Assistance Of Counsel At Sentencing.

Petitioner next contends that he was denied his right to the effective assistance of counsel at sentencing.  This contention is also without merit.

1.   Procedural History.

Petitioner pleaded no contest to the charge of second degree murder on February 14, 2006.  (LD 21, Clerk's Transcript ("CT") 69-71; 71A-L).  On March 15, 2006, Petitioner was sentenced to a term of fifteen years to life for second degree murder and the other charges were dismissed.  (LD 21, CT 75).  A series of letters attesting to Petitioner's good character were submitted to the trial judge as part of the sentencing hearing.  (LD 21, CT 109-150).  On July 19, 2006, after Petitioner had sent the trial judge a letter, new counsel for Petitioner filed a motion to withdraw the plea.  (LD 21, CT 166).  A hearing on the motion to withdraw the plea was held on August 29, 2006 and August 31, 2006, during which Petitioner and his former trial counsel both testified regarding whether Petitioner was fully informed by his trial counsel regarding the possibility of raising a mental health defense based on ADHD.  (LD 21, CT 189-238; 245-313).  At the conclusion of the hearing, the trial judge granted Petitioner's motion to withdraw the plea and reinstated the original charges.  (LD 21, CT 312).

Following the jury trial and the subsequent convictions discussed *supra*, the new trial judge conducted a second sentencing hearing on March 18, 2008.  (LD 20, Reporter's Transcript ("RT") 1479-1497).  At this second sentencing hearing, no letters of good character were proffered as they had been at the original sentencing.  The new trial judge indicated that he had read and considered the original probation report from 2006, as well as a new probation report prepared for the second sentencing hearing.  (LD 20, RT 1479).  During sentencing, defense counsel argued for the middle-term for the attempted murder convictions, based on Petitioner's mental health condition.  (Id. at 1481).  The new trial judge found that Petitioner's mental condition did not constitute a mitigating

18

1    circumstance and that, indeed, no mitigating circumstances existed.  (Id. at 1488).  The court also

2    found that four aggravating circumstances were present, i.e., that the crime involved violence and

3    great bodily harm, that Petitioner was on juvenile probation at the time of the offense, that he had a

4    history of multiple sustained juvenile petitions, and that Petitioner had not done well on juvenile

5    probation.  (Id. at 1488-1489).  Based on those circumstances, in addition to the mandated fifteen-

6    years-to-life sentence for second degree murder, the new trial judge sentenced Petitioner to the upper

7    term of nine years for the attempted murder conviction designated as the principle term, and made the

8    remaining attempted murder convictions consecutive to the principle term.  (LD 24, CT 984-987).

9    The resulting sentence was fifteen-years-to-life plus a determinate sentence of twenty-four years, eight

10   months.  (Id.).

11                    2.   The State Court Adjudication And AEDPA.

12          As Petitioner points out, the 5th DCA did not address the issue of whether trial counsel's failure

13   to offer mitigating evidence at sentencing constituted ineffective assistance of counsel.  Respondent

14   contends that Petitioner had the obligation to seek a rehearing before the 5th DCA in order to ensure

15   that the intermediate appellate court addressed the claim, and that his failure to do so means that the

16   "postcard" denial by the state supreme court was not a decision on the merits, citing People v.

17   Saunders, 5 Cal.4th 580, 592 n. 8 (1993).  (Doc. 15, p. 16).

18          A review of the state court proceedings, however, clearly indicates that Petitioner presented

19   this issue as a separate and distinct ground for ineffective assistance in both the 5th DCA and the

20   California Supreme Court.  The latter court rejected the claim with a "postcard" denial.  (LD 6).

21   Contrary to Respondent's contentions, such a summary denial is nevertheless considered a merits

22   adjudication for purposes of AEDPA review.  E.g., Luna v. Cambra, 306 F.3d 954, 960 (9th Cir. 2002);

23   Harris v. Superior Court, 500 F.2d 1124, 1127-1129 (9th Cir. 1974); Hunter v. Aispuro, 982 F.2d 344,

24   347-348 (9th Cir. 1992)(citing Harris and pointing out that this rule has been settled law in the 9th

25   Circuit for several decades).  Saunders is readily distinguishable since the footnote containing the

26   language upon which Respondent relies was a response to a collateral complaint by a dissenting

27   justice in that decision, and is, therefore, dicta.  Moreover, Saunders did not raise any issue related to

28   AEDPA and, even had it done so, any state court conclusion regarding what may or may not be a

1   merits decision for AEDPA purposes would not be binding on this Court.  The Ninth Circuit's

2   decisions, however, are.  Accordingly, the Court will analyse the issue as if the state supreme court's

3   denial of Petitioner's petition for review was a merits decision.  <u>Luna</u>, 306 F.3d at 960; <u>Harris</u>, 500

4   F.2d at 1127-1129; <u>Hunter v. Aispuro</u>, 982 F.2d at 347-348.

5          Where, as here, the state court denies a constitutional claim without an explicated decision, a

6   federal court reviewing a habeas corpus application pursuant to § 2254(a) " ha[s] no basis other than

7   the record for knowing whether the state court correctly identified the governing legal principle or was

8   extending the principle into a new context."  <u>Delgado v. Lewis</u>, 223 F.3d 976, 981-982 (9th Cir. 2000).

9   "While Supreme Court precedent is the only authority that is controlling under AEDPA, [a federal

10  habeas court] look[s] to Ninth Circuit case law as 'persuasive authority for purposes of determining

11  whether a particular state court decision is an "unreasonable application" of Supreme Court law.'"

12  <u>Luna</u>, 306 F.3d at 960.

13         In cases where the state court provides no *ratio decidendi*, the federal habeas court does not

14  conduct a de novo review; rather, it conducts an independent review of the record to determine

15  whether the state court erred in its application of U.S. Supreme Court law.  <u>Greene v. Lambert</u>, 288

16  F.3d 1081, 1089 (9th Cir. 2002)(holding that when there is an adjudication on the merits but no reason

17  for the decision, the court must review the complete record to determine whether resolution of the case

18  constitutes an unreasonable application of clearly established federal law); <u>Delgado</u>, 306 F.3d at 982

19  ("Federal habeas review is not de novo when the state court does not supply reasoning for its decision,

20  but an independent review of the record is required to determine whether the state court clearly erred

21  in its application of controlling federal law." ). Independent review is not de novo review of the

22  constitutional issue, but rather the only way a federal court can determine whether a silent state court

23  decision is objectively unreasonable.  <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003).

24         In order to determine a state court decision's reasonableness or unreasonableness, the Ninth

25  Circuit uses a "clearly erroneous" standard.  <u>See Van Tran v. Lindsey</u>, 212 F.3d 1143, 1153-1154 (9th

26  Cir. 2000).  A state court decision will be clearly erroneous if a careful review of the record and the

27  applicable case law leaves the reviewing court with the "firm conviction" that the state court was

28  wrong.  <u>See id</u>;  <u>Fisher v. Roe</u>, 263 F.3d 906, 915 (9th Cir. 2001)(*quoting* <u>Van Tran</u>).

1    While federal courts "are not required to defer to a state court's decision when that court gives

2  [them] nothing to defer to, [they] must still focus primarily on Supreme Court cases in deciding

3  whether the state court's resolution of the case constituted an unreasonable application of clearly

4  established federal law." Greene, 288 F.3d at 1089.  Nevertheless, while the Court's *review* of the

5  record will be conducted independently at to this issue, the Court must continue to show deference to

6  the state courts' ultimate decision.  See Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

7                          3.    Ineffective Assistance Of Counsel At Sentencing.

8    Here, Petitioner argues that counsel was ineffective at the second sentencing for failing to

9  resubmit letters attesting to Petitioner's good character.  While the state court record before this Court

10  clearly contains those letters, submitted at the first sentencing hearing, it is not at all clear whether

11  those same letters were part of the file the second trial judge reviewed and considered at the second

12  sentencing hearing.  As mentioned, the second trial judge indicated he had reviewed the original

13  probation report and had heard all of the evidence at trial, including Dr. Victoroff's medical testimony

14  regarding ADHD, presented at trial.  However, the record is simply silent regarding whether the

15  second trial judge specifically reviewed, or, indeed, was even aware of, the letters submitted in the

16  prior sentencing hearing.  Thus, without knowing whether the letters were considered by the second

17  trial judge, it is difficult to conduct a reliable analysis of counsel's ineffective in this regard.

18    Nevertheless, as Respondent argues, Petitioner's failure to establish the prejudice prong of

19  Strickland is fatal to this claim.  At sentencing, the new trial judge indicated that he had considered

20  Petitioner's mental condition, i.e., the ADHD, and did not believe it to constitute grounds for

21  mitigation.  Moreover, during trial, at least eleven witnesses—Ruth Lee, Lyle Furlow, Jr., Ron Huges,

22  Priscilla Garcia, Stephanie Henry, Esther Garcia, Mike Mazzei, Janice Gillespie, Larry Harris,

23  Christopher Hart, and Lyle V. Furlow--testified to matters relating to Petitioner's good character,

24  generosity, and lack of violence.  (E.g., LD 18 & 19, RT 1030-1032; 1067-1102; 1104-1107; 1111-

25  1119; 1122-1123; 1281-1291; 1299-1301).  Significantly, of the eleven witnesses, seven had also

26  provided letters at the first sentencing hearing.  Although, obviously, additional letters were presented

27  at the first sentencing hearing by persons who did not testify at trial for Petitioner, it must be noted as

28  well that four witnesses testified at trial who did not provide letters at the first sentencing hearing.

From these circumstances, it is impossible to conclude that providing additional letters apart from those who provided them at the first hearing and who also testified at the trial, would have impacted the trial judge's sentencing discretion.

Finally, it should be noted that the new trial judge found at least four aggravating factors--three relating to Petitioner's poor juvenile record and one relating to the level of violence and degree of injury suffered by the victims in the attack.  Defense counsel argued strenuously during the second sentencing hearing for a sentence in the middle-term.  However, given the new trial judge's explanation for why he was imposing this particular sentence, it seems extremely unlikely that there would have been anything defense counsel could have said or argued on Petitioner's behalf, or that there was anything contained in the letters of attestation now in this record, that would have convinced this judge to impose a less harsh sentence.

The Court has read and considered all of the letters submitted at the original sentencing and is of the opinion that nothing in those letters would have served as a counterweight to the new trial judge's emphasis on Petitioner's juvenile past and the violent nature of the offense sufficiently to have resulted in a lesser sentence.  The trial judge had little discretion regarding the sentence for second degree murder conviction; rather, the real issue was whether the court would impose the middle term or upper term for the principal term among the attempted murder convictions.  As mentioned, trial counsel argued strongly for the middle term, to no avail.  Also, as mentioned, the second trial judge had heard evidence at trial of Petitioner's good character.  However, given the trial judge's emphasis on Petitioner's juvenile history and the violent nature of the offense, it is this Court's view that, even had counsel resubmitted those same letters at the second sentencing that were presented at the first hearing, and even if counsel had strenuously argued Petitioner's good character to the new trial judge, it is not reasonably likely that these factors would have weighed sufficiently in the balance to affect the overall sentence in Petitioner's favor.  Put in Strickland terms, the Court cannot say that, had counsel proffered those letters at the second hearing, the outcome would more likely than not have been more favorable to Petitioner.  Hence, in the Court's independent review, it cannot be concluded that the state court adjudication was objectively unreasonable.  Himes v. Thompson, 336 F.3d at 853.

///

22

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), be DENIED.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within twenty (20) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   **March 11, 2013**               **/s/ Jennifer L. Thurston**
                                        UNITED STATES MAGISTRATE JUDGE